# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| TRINITY REGIONAL MEDICAL CENTER,<br><br>             Plaintiff,<br><br>vs.<br><br>ALEX M. AZAR II, in his capacity as Secretary of the Department of Health and Human Services,<br><br>             Defendant. | No. 17-CV-03029 LRR<br><br>**REPORT AND RECOMMENDATION** |

_____

## TABLE OF CONTENTS

I. Introduction…………………………………………………………………… 1

II. Background …………………………………………………………………… 2

III. Standard of Review …………………………………………………………… 7

IV. Variable Costs ………………………………………………………………… 9

V. Methodology for Calculating VDA Payment……………………………… 12

VI. Conclusion …………………………………………………………………… 20

### *I.    INTRODUCTION*

      This matter is before me for a Report and Recommendation regarding the merits of a Complaint for Judicial Review of Final Adverse Agency Decision on Medicare Reimbursement. (Doc. 1). Plaintiff Trinity Regional Medical Center (Hospital) appeals a decision by the Department of Health and Human Services (the Secretary) denying the

Hospital's administrative appeal related to the calculation of its reimbursement for treatment of patients insured through Medicare. On November 3, 2017, the Hospital filed its brief. (Doc. 14). On December 12, 2017, the Secretary filed his brief. (Doc. 17). On January 12, 2018, the Hospital filed its reply brief. (Doc. 22). On the same day, the Honorable Linda R. Reade, United States District Court Judge, referred this matter to me for a Report and Recommendation. At the Hospital's request, on February 13, 2018, I heard oral arguments on the case.

For the reasons that follow, I respectfully recommend that the Court **affirm** the Secretary's decision.

## II. BACKGROUND

Hospitals that treat patients with health insurance through the Medicare program are paid a predetermined fixed amount per patient based on that patient's diagnosis, irrespective of the actual cost of treatment to the hospital. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 406 n.3 (1993). This payment is called the Diagnosis Related Group (DRG) payment. Congress adopted the DRG payment method in 1983 to encourage hospitals to provide services at lower costs; prior to that, hospitals were reimbursed for their actual costs and had "'little incentive . . . to keep costs down,'" as "'[t]he more they spent, the more they were reimbursed.'" *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999) (first alteration in original) (quoting *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 974 (D.C. Cir. 1991)). Under the DRG method of payment, "[h]ospitals that treat patients for less than the DRG amount get 'rewarded,' while hospitals that spend more than the DRG amount must absorb the excess costs." *Cmty. Hosp. of Chandler, Inc. v. Sullivan*, 963 F.2d 1206, 1207 (9th Cir. 1992).

To provide some protection to rural hospitals, Congress also provided that sole community hospitals that experience a more than 5% decline in patients due to circumstances beyond their control are entitled to an additional payment, called a Volume

2

Decrease Adjustment (VDA). A VDA is a payment exception to accommodate the special needs of rural, low-volume medical providers during periods of significant and uncontrollable declines in inpatient volume. 42 U.S.C. § 1395ww(a)(2). A hospital is entitled to a VDA payment in the amount "necessary to fully compensate the hospital for the fixed costs it incurs in . . . providing inpatient hospital services, including the reasonable cost of maintaining necessary core staff and services." *Id.* § 1395ww(d)(5)(D)(ii).

The regulations promulgated by the Secretary in effect during the relevant time period involved in this case did not provide a specific formula for calculating the VDA payment. *See* 42 C.F.R. § 412.92(e)(3) (2009). Instead, the regulation directed that the following factors be considered in determining the VDA payment amount: "(A) [t]he individual hospital's needs and circumstances, including the reasonable cost of maintaining necessary core staff and services in view of minimum staffing requirements imposed by State agencies; (B) [t]he hospital's fixed (and semi-fixed) costs . . . ; and (C) [t]he length of time the hospital has experienced a decrease in utilization." *Id.* § 412.92(e)(3)(i). In addition, the regulation provided that the VDA payment could not exceed the difference between the hospital's total Medicare costs and the hospital's DRG payment. *Id.* § 412.92(e)(3).

A section of the Medicare Provider Reimbursement Manual (Manual or PRM), issued around the same time as the regulation, also addressed calculation of the VDA payment:

> [A VDA] payment is made to an eligible [hospital] for the fixed costs it incurs in the period in providing inpatient hospital services including the reasonable cost of maintaining necessary core staff and services, not to exceed the difference between the hospital's Medicare inpatient operating cost and the hospital's total DRG revenue.
> Fixed costs are those costs over which management has no control. Most truly fixed costs, such as rent, interest, and depreciation, are capital-

3

> related costs and are paid on a reasonable cost basis, regardless of volume. Variable costs, on the other hand, are those costs for items and services that vary directly with utilization such as food and laundry costs.
>
> In a hospital setting, however, many costs are neither perfectly fixed nor perfectly variable, but are semifixed. Semifixed costs are those costs for items and services that are essential for the hospital to maintain operation but also vary somewhat with volume. For purposes of [the VDA payment], many semifixed costs, such as personnel-related costs, may be considered as fixed on a case-by-case basis.
>
> In evaluating semifixed costs, [the Secretary] consider[s] the length of time the hospital has experienced a decrease in utilization. For a short period of time, most semifixed costs are considered fixed. As the period of decreased utilization continues, [the Secretary] expect[s] that a cost-effective hospital would take action to reduce unnecessary expenses. Therefore, if a hospital did not take such action, some of the semifixed costs may not be included in determining the amount of the payment . . . .

PRM 15-1 § 2810.1(B). The Manual also included two examples that illustrated that unless a hospital's Medicare costs exceeded a cap based on its Medicare costs for the previous year, the hospital's VDA payment would be calculated as "the entire difference between" the hospital's Medicare costs and its DRG payment. *Id.* § 2810.1(D). The example in the Manual does not explicitly say that the Medicare costs should include only fixed and semi-fixed costs, but in another example related to evaluating core staffing, the Manual states that if a hospital's staff exceeded the number allowed, Medicare costs in the formula should be "reduced to eliminate the salary costs" of the excess staff. *Id.* § 2810.1(C).

The amount of the VDA payment is initially determined by a hospital's Medicare administrative contractor (MAC), usually a private insurance company that contracts with the government to process hospitals' Medicare claims. The MAC's determination can be appealed to the Provider Reimbursement Review Board (the Board). An administrator for the Centers for Medicare and Medicaid Services (CMS), which administer the

4

Medicare program through authority delegated by the Secretary, may then review any decision of the Board.

The Hospital is a non-profit acute care hospital located in Fort Dodge, Iowa. At all times relevant to this case, the Hospital was qualified and reimbursed by the CMS as a sole community hospital. (AR 8).[1] In fiscal year 2007, the Hospital suffered a decline in inpatient discharges greater than five percent from the preceding cost reporting year. The Hospital asserted that the decline was due to external circumstances beyond the Hospital's control. Specifically, the Hospital stated that it lost several admitting physicians and was unable to recruit new physicians, and a shortage of psychiatrists forced it to close its Inpatient Behavioral Health Unit. (AR 399-401). As a result of this decrease, the Hospital requested a VDA from the Secretary in the amount of $812,333.[2] (AR 399-401).

On June 5, 2012, the MAC denied the Hospital's request. (AR 403-04). The MAC confirmed that the Hospital's inpatient discharges decreased by more than five percent from the prior year. (AR 420-23). The MAC determined, however, that the Hospital had already received DRG revenue that "exceeded the fixed/semi-fixed Medicare inpatient costs." (AR 404). In reaching this conclusion, the MAC excluded variable costs from the VDA payment calculation. (AR 403-04). The MAC determined that certain costs incurred by the Hospital were variable. (AR 403-04, 417-24). The MAC concluded that the Hospital's variable costs fell within five categories: (1) purchased laundry and linen services; (2) housekeeping; (3) dietary costs of food; (4) medical supplies charged to patients ("billable medical supplies"); and (5) drugs charged to patients (billable drugs). (AR 4, 291, 403-04, 417-18). These are expenses that the

---

[1] "AR" refers to the Administrative Record below (Doc. 9), and is followed by the applicable page number.
[2] The Hospital initially requested a VDA in the amount of $793,826, but adjusted this figure to $812,333 after finalizing its 2007 cost report. (AR 48-49).

MAC determined were "directly and indirectly related to patient volume" and found that the Hospital "failed to demonstrate otherwise." (AR 4). Based on this classification, the MAC determined that $5,514,226 of the Hospital's total operating costs of $27,549,808 were variable. This left $22,035,582 in fixed and semi-fixed costs. (AR 14, 73, 290). Because the DRG payments to the Hospital of $26,941.009 exceeded the Hospital's fixed and semi-fixed costs of $22,035,582, the MAC determined the Hospital was not entitled to a VDA payment.

The Hospital appealed the MAC's decision to the Provider Reimbursement Review Board (the Board). On December 15, 2016, following a hearing, the Board found that the MAC correctly identified and subtracted variable costs from the Hospital's VDA. (AR 47-55, 131-92). The Board also found the Hospital "provided incomplete source documentation, which [did] not tie back to the summary documents and [did] not provide proper evidence" to support the Hospital's claims. (AR 52-53). The Board concluded, however, that the MAC improperly calculated the Hospital's VDA. Rejecting both parties' calculation methodologies, the Board *sua sponte* utilized a calculation method pursuant to which the Hospital's "fixed/semi-fixed cost percentage can be developed to approximate the portion of the DRG payment that relates to the payment of fixed/semi-fixed costs." (AR 54). Using this methodology, the Board calculated the Hospital's VDA to be $581,537. (AR 54-55).

On December 23, 2016, the CMS Administrator notified the parties that he would review the Board's decision. (AR 40). The Director of the CMS Division of Acute Care, the MAC, and the Hospital each submitted comments. (AR 16-19, 20-27, 28-30). On February 9, 2017, the Secretary issued his decision. (AR 1-15). First, the Administrator affirmed the Board's affirmation of the MAC's identification and subtraction of variable costs, stating:

> The treatment of variable cost[s] within the calculation of the VDA is well established. The plain language of the relevant statute and regulation . . . make it clear that the VDA is intended to compensate qualifying hospitals for their fixed costs, not their variable costs. This position is also supported by past decisions, such as [*Greenwood*], where the Board correctly eliminated variable costs from the calculation. Therefore, the Administrator affirms the Board's decision regarding the elimination of variable costs from the [Hospital's] VDA payment adjustment request.

(AR 12). Second, the Administrator modified the Board's decision, rejecting its *sua sponte* calculation methodology. (AR 12-14). The Administrator found that the Board's VDA calculation methodology was "in direct contradiction to the statute and CMS's regulations and guidance wherein the intent is to compensate qualified hospitals for their fixed costs and not their variable costs." (AR 12). The Administrator concluded that the Board's methodology was "unsupported by the statute, regulations, manual, and prior case law." (AR 13). The Administrator instead concluded that the Hospital's "VDA is equal to the difference between its fixed and semi-fixed costs and its DRG payment." (AR 14). The Administrator agreed with the MAC that the Hospital was therefore not entitled to a VDA payment because its DRG payment exceeded its fixed and semi-fixed costs. (*Id.*).

The Administrator's decision is the final decision of the Secretary. The Hospital appealed to this Court, arguing that the Administrator's methodology for calculating VDA payment violates the plain language of the statute and that the Board's methodology should be employed instead. The Hospital also argues that the Administrator (as well as the Board and the MAC) erred in classifying any expenses as variable.

### III. STANDARD OF REVIEW

The Secretary's decision (the decision of the CMS Administrator) is the result of formal adjudication, and judicial review is governed by the standard set forth in the Administrative Procedure Act (APA). *See* 42 U.S.C. § 1395oo(f)(1) (Medicare Act

incorporates APA); *see also St. Mary's Hosp. of Rochester, Minn. v. Leavitt*, 416 F.3d 906, 909-10, 914 (8th Cir. 2005) (decisions of the Board and CMS Administrator involve formal adjudication entitled to *Chevron* deference). Under the APA, a reviewing court may set aside an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).

The Secretary's construction of its regulations and the statute it administers is entitled to substantial deference. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 94-95, 97-100 (1995) (discussing deference owed to CMS Administrator's decision made through formal adjudication when that decision was in accord with a provision in the Manual); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997) (deference to agency's construction of a regulation); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (deference to agency's construction of a statute). "A reviewing court should not reject reasonable administrative interpretation even if another interpretation may also be reasonable." *Shalala v. St. Paul-Ramsey Med. Ctr.*, 50 F.3d 522, 528 (8th Cir. 1995) (quoting *Creighton Omaha Reg'l Health Care Corp. v. Bowen*, 822 F.2d 785, 789 (8th Cir. 1987)). "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)) (discussing review of a decision by the CMS Administrator). The court should reject an agency interpretation, however, that is plainly erroneous or that contradicts the plain meaning of the statute, the plain meaning of the regulation, or "other indications of the [drafter's] intent at the time

of . . . promulgation." *St. Paul-Ramsey*, 50 F.3d at 527-28 (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512); *see also Chevron*, 467 U.S. at 843 n.9.

### IV. VARIABLE COSTS

The Hospital argues that the Secretary's exclusion of certain costs as variable was arbitrary and capricious and not supported by substantial evidence. The Secretary determined that the Hospital's costs related to (1) purchased laundry and linen services, (2) housekeeping, (3) dietary costs of food, (4) medical supplies charged to patients, and (5) drugs charged to patients were variable and thus, not compensable. The Hospital argues that the MAC "improperly reclassified as 'variable' the Hospital's expenses" in these categories. (Doc. 14, at 27). The Hospital argues that the Secretary "violated the statute and regulation by not considering the costs necessary for the Hospital to maintain its core staff and services" and the decision is "unsupported by substantial evidence because it ignores the voluminous and uncontradicted evidence in the record that the costs it identified as variable . . . were necessary to maintain the Hospital's core staff and services." (*Id.*). The Hospital argues that it had "already reduced its costs as much as possible such that the residual costs could not be eliminated, thereby qualifying them as at least semifixed costs for that particular hospital during that particular time period." (*Id.*). The Hospital faults the Secretary for not making specific findings regarding these assertions by the Hospital. (Doc. 14, at 27-28). Finally, the Hospital argues that the Secretary's classification of these costs as variable was arbitrary and capricious because it is "inconsistent with the agency's own interpretive guidelines in the PRM." (Doc. 14, at 28).

Neither the statute nor the regulation defines fixed costs. The Hospital relies on the definitions of fixed and semi-fixed costs that appear in the Manual. The manual defines fixed costs as costs "over which management has no control," and semi-fixed costs as costs "for items and services that are essential for the hospital to maintain

9

operation but also vary somewhat with volume." PRM 15-1 § 2810.1(B). The Hospital's argument ignores the definition of variable costs that appears in the Manual. The Manual defines variable costs as "those costs for items and services that vary directly with utilization[,] such as food and laundry costs." *Id*. Thus, the Manual explicitly recognizes that food and laundry costs—two categories of expenses at issue here—are variable costs.

The Hospital argues that whether an expense is classified as variable must be determined on a case-by-case basis. (Doc. 14, at 29). Although the decision to compensate semi-fixed costs is determined on a case-by-case basis, *id.*, the same cannot be said for variable costs. The regulation provides that when determining the VDA payment amount, the MAC should consider an "individual's hospital's needs and circumstances, including the reasonable cost of maintaining necessary core staff and services in view of minimum staffing requirements imposed by State agencies;" a hospital's "fixed (and semi-fixed) costs;" and "[t]he length of time the hospital has experienced a decrease in utilization." 42 C.F.R. § 412.92(e)(3)(i). At the time of the regulation's adoption, further explanation appeared in the Federal Register:

> Fixed costs are defined as those over which management has no control. Many truly fixed costs, for example, rent, interest, and depreciation, are capital-related costs and are paid on a reasonable cost basis, regardless of patient volume. Variable costs, on the other hand, are those costs for items and services that vary directly with utilization. However, in a hospital setting, many costs are neither perfectly fixed nor perfectly variable, but are semifixed. Semifixed costs are those costs for items and services that are essential for the hospital to maintain operation but which will also vary with volume. For purposes of this adjustment, many semifixed costs, such as personnel-related costs, may be considered as fixed costs on a case-by-case basis. *An adjustment will not be made for truly variable costs, such as food and laundry services*.

*Medicare Program, Fiscal Year 1990; Mid-Year Changes to the Inpatient Hospital Prospective Payment System*, 55 Fed. Reg. 15150, 15156 (Apr. 20, 1990) (emphasis added). Neither the statute nor the regulation prevents the Secretary from categorically

excluding certain costs as variable, and guidance issued at the time of the regulation's adoption (as well as the Manual) supports the Secretary's decision to categorically exclude certain costs as variable. That the Hospital could not reduce its expenses any further is insufficient to transform its variable costs into semi-fixed costs. *Cf. Trinity Reg'l Med. Ctr. v. Wis. Physician Servs.*, Dec. No. 2017-D1, 2017 WL 2403399, at *7 (H.C.F.A. Feb. 9, 2017) ("[E]ven assuming *arguendo* such [variable] costs could be considered semi-fixed or fixed, the [hospital] failed to provide convincing evidence (e.g., contracts) demonstrating that any portion of these costs was fixed or semi-fixed.").

The Secretary has routinely classified the types of costs at issue here as variable. *See id.* (affirming MAC's exclusion of costs related to "billable medical supplies, billable drugs, . . . [and] dietary and laundry as variable" because "the types of cost associated with all of [these] categories . . . would generally be expected to be inherently correlated to some degree with patient volume"); *Fairbanks Mem'l Hosp.*, 2015 WL 5852432, at *3 (Aug. 5, 2015) (affirming MAC's exclusion of costs related to medical supplies, pharmaceuticals, food, dietary formula, and linen and bedding as variable as "they either vary directly with utilization or are within the [hospital's] control"); *Lakes Reg'l Healthcare v. BlueCross BlueShield*, 2014 WL 5450078, at *2 (Sept. 4, 2014) (affirming MAC's exclusion of "billable medical supplies, billable drugs, [and] IV drugs . . . as variable costs"); *Unity Healthcare v. BlueCross BlueShield*, 2014 WL 5450066, at *5 (Sept. 4, 2014) (affirming MAC's exclusion of "billable medical supplies, billable drugs and IV solutions, . . . and dietary and linen expenses as variable"). The Secretary's decision to categorically exclude certain costs as variable was not arbitrary and capricious.

In sum, I find the Secretary's decision was supported by substantial evidence. I recommend the Court find that the Secretary did not err in the classification of these costs as variable and did not err in subtracting them from the Hospital's VDA.

## V. METHODOLOGY FOR CALCULATING VDA PAYMENT

The Hospital argues that the Secretary's methodology for calculating the VDA payment is arbitrary and capricious because it violates the plain language of the statute and is inconsistent with the example set forth in the Manual. (Doc. 14, at 20). The Hospital argues that the Secretary has since "recognized that the calculation methodology used in this case is inconsistent with the applicable statute" because on August 14, 2017, it adopted a new methodology to address this issue. (Doc. 14, at 22-23). The Hospital argues that "the Secretary's new methodology should have been applied retroactively as well, at least in pending cases such as this one, to reflect the reasoning of a number of PRRB decisions." (Doc. 14, at 23).

The statute provides that the VDA payment serves to "adjust[ ]" the DRG payment "as may be necessary to fully compensate the hospital for [its] fixed [Medicare] costs . . . , including the reasonable cost of maintaining necessary core staff and services." 42 U.S.C. § 1395ww(d)(5)(D)(ii). The Secretary calculated the VDA payment as the difference between the Hospital's fixed Medicare costs and its DRG payment. Thus, the Secretary's position is that the Hospital was fully compensated for its fixed Medicare costs by the DRG payment and VDA payment in combination, the amount of which totaled the Hospital's fixed Medicare costs. The Hospital argues that because the DRG payment compensates it for both fixed and variable Medicare costs, only that portion of the DRG payment related to fixed costs should be subtracted from its fixed Medicare costs to determine the amount of the VDA payment. The Hospital argues that under the plain language of the statute, it is entitled to payment for a portion of its fixed and variable Medicare costs as usual (by the DRG payment), plus an adjustment (the VDA payment) to compensate it for its total fixed Medicare costs. The Secretary rejected the methodology advocated by the Hospital (and employed by the Board) precisely because it would compensate the Hospital for the totality of its fixed Medicare costs, plus some

of its variable Medicare costs, which the Secretary does not believe is required by the statute.

The Secretary's interpretation was not an unreasonable, or arbitrary and capricious, interpretation of the plain language of the statute. The statute requires that a hospital be "fully compensate[d]" for its fixed Medicare costs through a combination of the VDA payment and the DRG payment (indeed, the Hospital recognizes that the VDA payment need not equal its fixed Medicare costs and that whether its fixed costs have been fully compensated is based on both the VDA and DRG payments). Here, the Hospital received payment (through both the DRG and VDA payments) totaling its fixed Medicare costs. That is all that the plain language of the statute requires. The statute is ambiguous as to whether a hospital must also receive its usual share of reimbursement (through the DRG payment) for its variable costs. Although the Secretary could have reasonably interpreted the statute to require the usual partial payment for variable Medicare costs in addition to payment for the totality of a hospital's fixed Medicare costs, as advocated by the Hospital, the Secretary's interpretation is also reasonable. It is therefore entitled to deference.[3]

---

[3] The Hospital's (and the Board's) interpretation seems more in line with the purpose of the VDA payment set forth in the Manual. The Manual suggests that the VDA payment is meant to reimburse a hospital during a slow year for its fixed costs, which it has no control over, but not for unnecessary variable costs that "vary directly with utilization" and that a hospital could "take action . . . to reduce." PRM 15-1 § 2810.1(B). The DRG payment, on the other hand, compensates the hospital for costs it incurs treating patients, which necessarily include variable costs it incurs, such as for a patient's food and laundry. Thus, a hospital could not "take action . . . to reduce" the variable costs covered by the DRG payment, because those costs are being incurred due to utilization—for example, a hospital treating patients who have to be fed and whose sheets have to be laundered. Nevertheless, it is unclear from the statute (and the regulation) whether these variable costs should be compensated, regardless of whether the hospital can do anything to avoid them. The Secretary's interpretation of the statute is reasonable and thus owed deference, and a court may not reject it merely because a court may find a "competing interpretation[ ] [would] best serve[ ] the regulatory purpose." *Thomas Jefferson Univ.*, 512 U.S. at 512.

The Hospital's reliance on the Secretary's adoption of new regulations that apply prospectively to cost-reporting periods beginning on or after October 1, 2017, is misplaced. 42 C.F.R. § 412.92(e)(3). The new regulations adopt the methodology employed by the Board here. *Id.* When the Secretary adopted the new regulations, the Secretary stated:

> We continue to believe that our current approach in calculating [VDA payments] is reasonable and consistent with the statute. The relevant statutory provisions . . . are silent about and thus delegate to the Secretary the responsibility of determining . . . what level of adjustment to [DRG] payments may be necessary to ensure that total Medicare payments have fully compensated [a hospital] for its "fixed costs." These provisions suggest that the [VDA payment] amount should be reduced (or eliminated as the case may be) to the extent that some or all of [a hospital's] fixed costs have already been compensated through other Medicare . . . payments. . . . Nevertheless, we understand why hospitals might take the view that CMS should make an effort, in some way, to ascertain whether a portion of [DRG] payments can be allocated or attributed to fixed costs in order to fulfill the statutory mandate to "fully compensate" a qualifying [hospital] for its fixed costs.
> Accordingly, after considering these views, . . . we proposed to prospectively change how the MACs calculate the [VDA payment] and require that the MACs compare estimated Medicare revenue for fixed costs to the hospital's fixed costs to remove any conceivable possibility that a hospital that qualifies for the [VDA payment] could ever be less than fully compensated for fixed costs as a result of the application of the adjustment.

*Medicare Program; Hospital Inpatient Prospective Payment System and Policy Changes*, 82 Fed. Reg. 37990, 38180 (Aug. 14, 2017).

The Hospital argues that the Secretary acknowledged through this statement that the methodology employed by the CMS Administrator here violated the plain meaning of the statute. Although the Secretary acknowledged the possibility that a hospital may not be fully reimbursed for its fixed costs under the old methodology, that possibility involved the fixed-costs cap based on the previous year's costs, which is not at issue here. *See id.*

at 38181 ("[U]nder the current methodology, but not under our proposed methodology, it is possible that a hospital would still receive no [VDA] payment even if its Medicare fixed costs exceeded its total [DRG payment] if those fixed costs exceeded the previous year's costs updated for inflation."). In cases where, like here, a hospital's fixed Medicare costs were less than the previous year's fixed Medicare costs adjusted for inflation, the Secretary's employed methodology ensured that all of a hospital's fixed costs would be covered by the DRG and VDA payments in combination. That the Hospital's fixed Medicare costs may not have been fully reimbursed if subject to the cap has no bearing on the reasonableness of the Secretary's action here.

That the Secretary changed his interpretation of the statute does not prove that the previous interpretation was unreasonable.

> [T]hat an agency interpretation contradicts a prior agency position is not fatal. Sudden and unexplained change or change that does not take account of legitimate reliance on prior interpretation may be arbitrary, capricious or an abuse of discretion. But if these pitfalls are avoided, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.

*Baptist Health v. Thompson*, 458 F.3d 768, 777 (8th Cir. 2006) (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996)). Here, both the old and new methodologies are reasonable interpretations of an ambiguous statute.

Contrary to the Hospital's argument, the Secretary consistently applied the methodology used here to determine the amount of the VDA payment (changing its methodology only after a new regulation, adopted through notice-and-comment rulemaking, went into effect). The Hospital cites no final agency decision to support its argument that the Secretary applied inconsistent methodologies, relying instead on a statement in the preamble to the proposed new regulations in the Federal Register: "[I]n . . . adjudications, the [Board] and the CMS Administrator have recognized that . . . [a hospital's VDA payment] should be reduced to reflect the compensation of *fixed costs*

15

Case 3:17-cv-03029-LRR-MAR   Document 32   Filed 03/19/18   Page 15 of 20

that has already been made through [ ]DRG payments." *Medicare Program; Hospital Inpatient Prospective Payment Systems and Proposed Policy Changes*, 82 Fed. Reg. 19796, 19933 (Apr. 28, 2017) (emphasis added). This statement is not inconsistent with the methodology employed here.

As explained above, the Secretary considered the entire DRG payment as compensating a hospital's fixed costs (because the statute does not require that a hospital be compensated for any of its variable costs, even if the DRG payment ordinarily compensates a hospital for some of those costs). This conclusion is bolstered by the final agency decisions cited by the Secretary in support of its statement in the preamble, all of which employ the methodology used here. *See Lakes Reg'l Healthcare Spirit Lake v. Blue Cross Blue Shield Ass'n*, Dec. No. 2014-D16, 2014 WL 5450078, at *6 (H.C.F.A. Sept. 4, 2014) (determining VDA payment as the difference between the hospital's fixed and semi-fixed costs and its DRG payment); *Unity HealthCare v. Blue Cross Blue Shield Ass'n*, Dec. No. 2014-D15, 2014 WL 5450066, at *5 (H.C.F.A. Sept. 4, 2014) (same), *appeal pending*, *Unity HealthCare v. Azarl*, No. 18-1316 (8th Cir.); *Greenwood Cnty. Hosp. v. BlueCross BlueShield Ass'n*, Dec. No. 2006-D43, Case No. 04-0025, 2006 WL 3050893, at *6 (P.R.R.B. Aug. 29, 2006); *Fairbanks Mem'l Hosp. v. Wis. Physician Servs.*, Dec. No. 2015-D11, 2015 WL 5852432, at *4-5 (H.C.F.A. Aug. 5, 2015) (same; rejecting Board methodology of fixed Medicare costs less a ratio of the DRG payment related to fixed costs); *see also Trinity Reg'l Med. Ctr. v. Wis. Physician Servs.*, Dec. No. 2017-D1, 2017 WL 2403399, at *7-9 (P.R.R.B. Feb. 9, 2017) (rejecting methodology employed by the Board here and affirming that "VDA is equal to the difference between . . . fixed and semi-fixed costs and . . . DRG payment"). Since at least 2006, the Secretary's final decisions have consistently employed the methodology used here. The Secretary's decision was not arbitrary and capricious, despite the

16

Case 3:17-cv-03029-LRR-MAR   Document 32   Filed 03/19/18   Page 16 of 20

agency's prospective policy change to employ the methodology advocated by the Board and the Hospital.

The Hospital also argues that the methodology employed by the Board is inconsistent with the example set forth in the Manual. As an initial matter, the Manual contains interpretative rules adopted without notice and comment, and it is intended to provide guidance without binding the Secretary. *See St. Paul-Ramsey*, 50 F.3d at 527 n.4. As such, "'[a]n action based on a violation of [the Manual] does not state a legal claim' because interpretative rules are not mandatory and 'never can be violated.'" *Id.* (first alteration in original) (quoting *Drake v. Honeywell, Inc.*, 797 F.2d 603, 607 (8th Cir. 1986)); *see also Saint Marys Hosp. of Rochester v. Leavitt*, 535 F.3d 802, 808 (8th Cir. 2008) ("[T]he [Manual], while a useful guide to interpreting the Medicare statute and regulations, is not strictly binding on the Secretary." (internal quotation marks omitted) (quoting *Baptist Health*, 458 F.3d at 778 n.9)).[4]

In any event, it is not clear whether the methodology employed by the Secretary here is inconsistent with the Manual. The Hospital is correct that when read in isolation, examples in the Manual support that the VDA payment should be calculated as a hospital's total Medicare costs (including variable costs) less a hospital's DRG payment: the examples explain that when a hospital's "Program Inpatient Operating Cost [is] less than" the cap, "its [VDA payment amount] is the entire difference between [its] Program Inpatient Operating Cost and [its] DRG payments." PRM 15-1 § 2810.1(D), Example A (illustrating VDA payment not subject to the cap); *see also* PRM 15-1 § 2810.1(D), Example B (illustrating VDA payment affected by the cap). The Manual explains that

---

[4] Language in the Manual itself also supports that the examples relied on by the Hospital here are not meant to bind the Secretary: the Manual includes a note after the examples, stating that "[i]f [a MAC] determines that the procedures in this section, when applied to a specific adjustment request, generate an anomalous result, the [MAC] may request a review by [the Board and CMS Administrator]." PRM 15-1 § 2810.1(D).

the VDA payment is calculated under the assumption that the hospital "budgeted based on prior year utilization and . . . had insufficient time in the year in which the volume decrease occurred to make significant reductions in cost." PRM 15-1 § 2810.1(D). Thus, the VDA payment "allows an increase in cost up to the prior year's total Program Inpatient Operating Cost . . . increased" for inflation. *Id.*

On the other hand, the Manual makes clear that a VDA payment should compensate a hospital for its fixed and semi-fixed costs, but not its variable costs. PRM 15-1 § 2810.1(B). And the Manual recognizes that a MAC should "evaluat[e] semifixed costs" to determine whether a hospital could have "take[n] action to reduce unnecessary expenses;" if so, the Manual instructs that "some of the semifixed costs may not be included in determining the amount of the [VDA] payment." *Id.* This provision seems at odds with the example's use of total Medicare costs (as opposed to fixed and semi-fixed costs) in determining the VDA amount. The Board explained in a 2006 decision:

> [T]he text [of the Manual] explicitly dictates that fixed (and semi-fixed) costs may comprise the [VDA payment], [but] the use of the term "operating costs" in the subsequent examples may suggest that variable costs could be included. However, the Board finds that the examples are intended to demonstrate how to calculate the [VDA payment cap] as opposed to determining which costs should be included in the [VDA payment].

*Greenwood Cnty. Hosp.*, 2006 WL 3050893, at *6 n.19 (citations omitted). That "Program Inpatient Operating Cost" in the example does not include a hospital's variable costs is further supported by another example in the Manual, which involves calculating whether a hospital had excess staff that could have been reduced:

> Hospital B's nursing staff[ ] . . . exceeds the core staff [allowed] . . . . Hospital B is eligible for a [VDA] payment . . . , but its cost . . . must first be reduced to eliminate the salary costs of the . . . excess of core staff. Once the excess salary costs are eliminated, the cost report is re-run, generating a new Program Inpatient Operating Cost that is the basis for the [VDA] payment . . . .

PRM 15-1 § 2810.1(C)(6)(a), Example B. Thus, "Program Inpatient Operating Cost" does not necessarily mean a hospital's total Medicare costs, but rather, the costs a hospital is eligible to have reimbursed (which does not include variable costs). The Secretary could reasonably read the Manual as supporting its methodology of the difference between a hospital's fixed and semi-fixed costs (a hospital's eligible costs) and a hospital's DRG payment. And as discussed above, the Secretary has consistently employed the methodology used here and is not bound by the Manual. Thus, any inconsistency with the Manual is irrelevant.

I note that identical arguments were raised in *St. Anthony Regional Hospital v. Azar*, 16-CV-3117-LTS (N.D. Iowa). In that case, Magistrate Judge Kelly K.E. Mahoney issued a Report and Recommendation concluding, as I do, that the methodology employed by the Secretary was reasonable, and the Secretary's resulting decision was not arbitrary and capricious nor inconsistent with the law. (Doc. 22). Indeed, I have adopted much of Judge Mahoney's Report and Recommendation in this one because I found her analysis sound and her articulation clear. Chief Judge Strand, similarly, found Judge Mahoney's analysis sound, adopting the Report and Recommendation over the hospital's objections. Chief Judge Strand explained:

> The Hospital incorrectly frames the issue by claiming to have lost reimbursement for variable expenses otherwise authorized by statute. The Hospital has been reimbursed for some variable expenses covered by the DRG payment but there is no authority authorizing reimbursement for variable expenses beyond those incidentally included in the DRG payment. The Hospital seems to assert that hospitals are generally entitled to dollar-for-dollar reimbursement of all Medicare costs, but this is not true under either payment. The record suggests that the Hospital was unable to reduce its volume-related costs in accordance with shrinkage—an eventuality anticipated by the VDA payment and explicitly exempted from reimbursement. *See generally* PRM 15-1 § 2810.1(B). The Secretary's interpretation of the statute, as demonstrated through the methodology used to calculate the VDA payment, is neither plainly wrong nor remotely

unreasonable.

(Doc. 27, at 13-14 (footnote omitted)). *See also Unity Healthcare v. Hargan*, Case No. 14-CV-121-HCA (S.D. Iowa, Doc. 39) & *Lakes Reg'l Healthcare v. Hargan*, Case No. 14-CV-4097-HCA (N.D. Iowa, Doc. 40) (similarly finding that the Secretary's calculation methodology was not arbitrary and capricious).

Therefore, I recommend the Court find that substantial evidence supported the Secretary's decision and that the Court affirm the decision.

## VI. CONCLUSION

For the reasons set forth above, I respectfully recommend the Court **affirm** the Secretary's decision and enter judgment in favor of the Secretary.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CIV. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CIV. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 19th day of March, 2018.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa